IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **KATHLEEN BORYS,** : | |
| : | |
| **Plaintiff,** : | |
| : | Case No. 03-CV-1162 |
| v. : | |
| : | JUDGE ALGENON L. MARBLEY |
| **METROPOLITAN LIFE INSURANCE** : | |
| **COMPANY METLIFE DISABILITY,** : | Magistrate Kemp |
| **Defendant.** : | |

## OPINION AND ORDER

### I. INTRODUCTION

This matter comes before this Court on Plaintiff, Kathleen Borys', Motion for Judgment on the Administrative Record (Pl. Mot.) and Defendant, Metropolitan Life Insurance Company's ("MetLife"), Cross-Motion for Judgment on the Administrative Record (Def. Mot.). Plaintiff seeks long-term disability ("LTD") benefits under the IBM Long Term Disability Plan ("Plan") maintained by Defendant. This action arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*. For the reasons set forth below, Plaintiff's Motion for Judgment is **GRANTED** and Defendant's Cross-Motion for Judgment is **DENIED**.

### II. FACTS

Plaintiff worked as a database manager at IBM. At some point in 1998, Plaintiff was diagnosed with post traumatic stress disorder and clinical depression. She stopped working on May 6, 1998, and, at that time, she began receiving short-term disability benefits, which lasted

from May 1998 through May 1999.[1] (Admin. Rec. 28). In March 1999, Plaintiff applied for LTD benefits, citing "clinical depression, post traumatic stress disorder caused by harassment on the job for a prolonged period." (Admin. Rec. at 361-62). Two mental health professionals prepared reports in support of her application for benefits: (1) a psychiatrist, Steven Schneir, M.D., who had been treating Plaintiff regularly since fall of 1998, (Admin. Rec. 207, 267-68); and (2) John Egan, LISW,[2] a counselor working under Dr. Schneir's guidance.[3] (Admin. Rec. at 212-215). Both Dr. Schneir and Mr. Egan found plaintiff incapacitated by major depression and post traumatic stress disorder. (Admin. Rec. 207-210, 363-65, 212-15). In July 1999, MetLife approved Plaintiff's LTD application and she began receiving LTD benefits retroactive until May 17, 1999.[4] (Admin. Rec. at 191-192).

To receive LTD benefits under MetLife's Plan, a participant must demonstrate that she has fulfilled certain conditions.[5] First, she must be totally disabled, meaning that "because of a

---

[1] MetLife's approval of these benefits was based on several diagnoses. Her physician at that time, Teresa Quinlin, M.D., concluded that Plaintiff suffered from chronic fatigue syndrome, anxiety and panic attacks, which were exacerbated by her work environment. (Pl. Mot at 1) (citing Admin. Rec. at 255-56, 293). Her psychologist, Julia Brodie, Ph.D., diagnosed her with post traumatic stress disorder and anxiety disorder. (Pl. Mot at 2) (citing Admin. Rec. at 251-54). Additionally, an IBM-selected doctor, Stephen Pariser, M.D., found Plaintiff unable to work due to major depression, panic disorder, and possible post traumatic stress disorder. Dr. Pariser found that her employment played a significant role in her mental health issues. (Pl. Mot. at 2) (citing Admin. Rec. at 225-228).

[2] An LISW is a Licensed Independent Social Worker.

[3] Both Dr. Schneir and Mr. Egan are employed by Pinnacle Behavioral Health, a mental health outpatient center located in Columbus, Ohio.

[4] MetLife awarded Plaintiff LTD benefits retroactive to May 1999.

[5] The Plan expressly places the burden on the claimant to prove his or her disability: "At your own expense, proof of disability, satisfactory to Metropolitan, must be submitted to

sickness or injury, [she] cannot perform the important duties of [her] occupation or any other gainful occupation for which [she is] reasonably fit by [her] education, training or experience." (Admin. Rec. 387). Second, she must be "under the appropriate care and treatment of a doctor on a continuing basis."[6] (Admin. Rec. 387). Third, MetLife requires that the participant, at her own expense, submit "proof of disability, satisfactory to Metropolitan." (Admin. Rec. at 387).

According to Plaintiff, an LTD benefit recipient is also required to seek Social Security Disability Benefits ("SSDB"). Defendant disputes this characterization, arguing that the Plan language does not state such, but concedes that the Plan does contain an offset for SSDB. (Admin. Rec. at 391) ("The benefits payable under the LTD Plan will be reduced by: the actual or estimated primary Social Security Disability Income benefits which you are . . . entitled to by reason of your disability). On August 24, 1999, the Social Security Administration ("SSA") determined Plaintiff totally disabled and awarded her disability benefits, retroactive to May 6,

---

Metropolitan." (Admin. Rec. at 387).

[6]"Appropriate Care and Treatment" is defined as medical care and treatment that meets all of the following requirements:

1. It is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;
2. It is necessary to meet your basic health needs and is of demonstrable medical value;
3. It is consistent in type, frequency and duration of treatment with relevant guidelines of national medical, research and health care coverage organization and governmental agencies;
4. It is consistent with the diagnosis of your condition and
5. It's [sic] purpose is maximizing your medical improvement.

(Admin. Rec. at 387).

Doctor is defined, in pertinent part, as a person who "is legally licensed to practice medicine." *Id.*

-3-

1998.[7] (Admin. Rec. at 94-97). Prior to this determination, MetLife sent Plaintiff several letters urging her to request SSDB and offering the complimentary services of a law firm, Kennedy & Associates, to help her pursue her these benefits.[8] This campaign included a "Reimbursement Agreement for Social Security" form, signed by Ms. Borys on March 16, 1999, which warned that if MetLife did "not receive the Social Security Award information or the denial notice," it would "estimate Primary Social Security Benefits in calculating [Ms. Borys'] LTD benefit" and subtract accordingly. (Admin. Rec. at 132).[9] Additionally, this form explained that if SSDB were awarded retroactively to a certain date, the plan participant had to reimburse MetLife for any overpayment made. (Admin. Rec. at 196, 132) ("If there is an overpayment, it is your responsibility to return the overpaid amount to Metropolitan.").

From September 2, 1999 through mid-2000, Plaintiff met regularly with Dr. Schneir, who prescribed numerous medications for Plaintiff. (Admin. Rec. at 145-47, 172-83, 263-270). Dr. Schneir periodically informed MetLife of Plaintiff's progress. His last letter to MetLife containing a substantive report on Plaintiff's health is dated April 1, 2000. (Admin. Rec. at 135)

---

[7]Although Ms. Borys does not appear to have submitted the underlying medical evaluation used by the SSA to determine her award of benefits, a "Notice of Disability Examination" is included, which explains that a "mental status evaluation" will be conducted by Marc Miller, Ph.D., on July 21, 1999. (Admin. Rec. at 194). Moreover, this Court assumes that Plaintiff received her three year check up. *Napier v. Hartford Life Ins. Co.*, 282 F. Supp. 2d 531, 539 n.4 (E.D. Ky. 2003) ("This Court must assume that the Social Security Administration is fulfilling its statutory mandate to re-examine Napier once every three years to ensure the existence of a continued disability. 42 U.S.C. § 421(i).").

[8]These letters are dated March 12, 1999 (Admin. Rec. at 195); September 17, 1999 (Admin. Rec. at 189); and March 20, 2000 (Admin. Rec. at 155);

[9]Indeed, on May 13, 1999, Ms. Borys basic monthly benefit was reduced by the "Estimated Primary Social Security Disability benefits" from $2873.01 to $1501.01. (Admin. Rec. at 197).

-4-

(diagnosing her as having "Major Depression - Recurrent," "Post-Traumatic Stress Disorder" and "Chronic Fatigue Syndrome" and noting, inter alia, that she has "little support from husband, few friends if any and is disabled from work"). Between her visits with Dr. Schneir, Plaintiff also participated in psychotherapy with Mr. Egan. (Admin. Rec. at 174, 178, 181). In mid-2000, Plaintiff stopped her regular sessions with Dr. Schneir because, after many unsuccessful attempts to improve Plaintiff's condition with medication, Dr. Schneir made a decision to discontinue medication trials.[10] Dr. Schneir explained this situation in a letter written on July 8, 2003, which stated as follows:

> I initially saw Ms. Kathleen Borys September 2, 1998. Subsequently we had trials of Zoloft, Celexa, Effexor, Serzone, Wellbutrin with and without Lithium, Remeron, Paxil and Nortiptyline. She was either intolerant of the medication or had no response. In mid-2000, because of the aforementioned, the decision was made to discontinue medication trails [sic]. She was going to continue with psychotherapy.

(Admin. Rec. at 46).

On October 26, 2000, Dr. Schneir notified MetLife that he was no longer seeing Plaintiff, which was acknowledged by the claims manager on November 29, 2000.[11] (Admin. Rec. at 110, 14). Thereafter, Plaintiff continued her sessions with Mr. Egan, who provided periodic reports to MetLife regarding Plaintiff's disability and her prognosis. (Admin Rec. at 84, 71, 57). In large part, these reports, dated March 26, 2001, March 3, 2002, and March 31, 2003, contained essentially the same diagnoses. (Admin. Record at 71-72, 84-85, 57-60). His March 3, 2002

---

[10] According to Defendant's Cross-Motion for Judgment, it was not until July 8, 2003 that Dr. Schneir actually wrote the letter that explained that Plaintiff's medication had been discontinued in mid-2000 for non-responsiveness.

[11] On November 29, 2000, MetLife's Mark Salerno noted that "Dr. Schneir stated he is not seeing [Plaintiff]." (Admin. Rec. at 14).

-5-

assessment reads, in part, as follows:

> Despite very active and motivated work in psychotherapy . . . Ms. Borys remains a deeply distrustful individual. She is chronically withdrawn, appears to trust no one but her husband and perhaps, the undersigned, and continues to leave her rather isolated rural home only when absolutely necessary. She remains depressed and very pessimistic, her essential feeling of hopelessness being a significant deterrent to change in treatment.

(Admin. Rec. at 71-72).

In January 2003, Plaintiff completed an "Activities of Daily Living" form on which she indicated that she was still seeing Mr. Egan, but was no longer seeing Dr. Schneir. (Admin. Rec. at 103). Upon receiving this form, MetLife requested updated information from both Mr. Egan and Plaintiff (Admin. Rec. at 69), and subsequently learned that Plaintiff was no longer under the treatment of any physician and that no referrals to a psychiatrist were contemplated. (Admin. Rec. at 62, 60). On April 25, 2003, MetLife sent Plaintiff's file to an Independent Physician Consultant ("IPC"), Ernest Gosline, M.D.[12] to determine the severity of her condition. (Admin. Rec. at 21). On April 28, 2003, Dr. Gosline found that, "there does not appear to be such a global impairment of function to preclude this person from performing some form of employment that is commensurate with her ETE." In answer to the question, "[d]o you feel that EE is under appropriate care and treatment as defined in the IBM contract plan as specified?", Dr. Gosline stated:

> [I]t does not appear to be appropriate care and treatment. This case is being monitored simply by a social work therapist and for whatever reason the therapy appears to be relegated simply and merely to discussing interpersonal issues and difficulties in interpersonal relationships, rather than dealing with any major psychiatric disorder, although such disorder is being claimed. This person is not being treated by a mental health specialist who is legally licensed to practice

---

[12]Dr. Gosline is a board-certified psychiatrist.

-6-

medicine and such a person would not be considered a "doctor."

(Admin. Rec. at 52).

On June 6, 2003, MetLife terminated Plaintiff's LTD benefits. In its denial letter, MetLife noted that LTD benefits are only appropriate where the recipient is disabled from any gainful employment for which she was reasonably fit for education, training and experience, and must be receiving "appropriate care and treatment." (Admin. Rec. at 37-40). The letter continued:

> It is Gosline's opinion that the information in the file does not support your inability to perform your own occupation or any gainful occupation based on your prior education, training, and experience. Dr. Gosline does not feel that the medical record shows that you have been receiving Appropriate Care and Treatment aimed at maximum medical improvement. You are treating with a therapist without the benefits of medication therapy and appropriate titration and compliance. In addition the treatment plan does not appear to be directed to providing for return of work or rehabilitation. The therpay [sic] appears to be relegated to simply discussing interpersonal issues.

(Admin. Rec. at 48).

On October 13, 2003, Plaintiff, represented by counsel, appealed to MetLife, (Admin. Rec. at 37-40), and, on October 28, 2003, MetLife sent Plaintiff's file to another board-certified psychiatrist, Ian Lipsitch M.D., for his review. On November 3, 2003, Dr. Lipsitch found as follows:

> The fact that claimant was not taking medications is not per se inappropriate treatment in view of what appear to be persistent and sustained efforts to find a regimen that would both help her and be tolerated by her.
>
> . . . .
>
> It is impossible to assess the appropriateness of the psychotherapy she was receiving since the details of the content and quality of the interaction between the therapist and the claimant is not described in the notes or the letters . . . Thus,

> while the frequency of the treatment is appropriate in view of the length of treatment, the content, technique and focus are impossible to evaluate.
>
> . . . .
>
> The available clinical documentation does not provide objective information documenting that the claimant, based on her psychiatric disorder, is experiencing sustained, global impairments in her ability to function of a severity that would preclude her being able to perform in an appropriate job. The most recent data is that from the [sic] Mr. Egan's progress notes and the 3/31/03 functional assessment. The claimant is described as suspicious, depressed, anxious, and withdrawn, none of which implies any specific functional impairment. What is listed as function impairments are poor concentration, extreme suspiciousness and mistrust, and withdrawal from social interactions. This list appears to be derived from the subjective reports of the claimant rather than objective observations by any independent observer.

(Admin. Rec. at 31-33).

After receiving Dr. Lipsitch's report, MetLife denied Plaintiff's appeal that same day, stating "Dr. Lipsitch's professional opinion and the available clinical documentation does not provide objective information documenting that Ms. Borys is experiencing sustained global impairments in her ability to function of a severity that would preclude her [sic] from being able to perform an appropriate job." (Admin. Rec. at 29). Defendant also noted:

> The medical information provided for our review does not provide us with objective clinical findings such as recent cognitive testing or a mental status exam revealing current objective observations. Therefore, we have not been provided with medical documentation substantiating Ms. Borys' inability to perform any gainful occupation as identified in her group plan.

(Admin. Rec. at 29). The termination letter did not address Dr. Lipsitch's finding that "[i]t is impossible to assess the appropriateness of the psychotherapy she was receiving since the details of the content and quality of the interaction between the therapist and the claimant is not described in the notes," nor did it mention Plaintiff's receipt of SSDB.

-8-

After exhausting her administrative remedies, Plaintiff filed this Motion for Judgment, requesting a judgment against Defendant for all disability benefits accrued and unpaid to the date of the judgment and a declaratory judgment that Plaintiff is an eligible participant under the Plan and is entitled to monthly disability benefits.

## III. STANDARD OF REVIEW

A denial of benefits under an ERISA plan is typically reviewed under a *de novo* standard; however, where the benefit plan grants "the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," the deferential arbitrary and capricious standard of review applies. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Plaintiff concedes that the Plan gives MetLife the discretionary authority to determine eligibility, and agrees that the applicable standard of review is arbitrary and capricious. (Pl. Mot. at 9). Plaintiff, however, argues that a conflict of interest exists because MetLife both reviews and pays claims for benefits, and argues that the Court should consider this conflict of interest when determining whether the denial of benefits is arbitrary and capricious. (Pl. Mot. at 9). Defendant counters that no conflict of interest is inherent in MetLife's position because IBM, not MetLife, funded the plan when "her claim was reviewed and her benefits were terminated in 2003." (Def. Mot. at 9-10). Defendant points this Court to the Plan provision titled,"Plan Funding," which states as follows:

> Any monthly Long-Term Disability benefit payable to you under the terms of the Long-Term disability Plan after the end of the calendar year in which you are entitled to first received such benefits will be . . . funded by IBM, which may pay such benefits directly or may insure all or part of the benefits on a year-by-year basis.

(Admin. Rec. at 402). Neither Defendant nor the Administrative Record provides the date on which this provision took effect in Plaintiff's case. Defendant also did not make clear what impact, if any, IBM's benefit payments have on MetLife if IBM chooses "to insure all of part of the benefits on a year-by-year basis." *Id.* In light of the language provided in the Plan Funding provision, however, the Court will assume for argument's sake that there is no inherent conflict of interest.

The arbitrary and capricious standard "is the least demanding form of judicial review of administrative action" and requires a court to decide "whether the plan administrator's decision was rational in light of the plan's provisions." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003) (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). The Sixth Circuit recently cautioned, however, that the arbitrary and capricious standard is not merely a "rubber stamp" for a plan administrator's decision. *McDonald*, 347 F.3d at 172. Rather, the standard must include "some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.*

Finally, in determining whether a denial of disability benefits was arbitrary and capricious, a court is "required to consider only the facts known to the plan administrator at the time he made his decision." *McDonald v. Western-Southern Life Ins.*, No. C2-98-414, 2001 WL 1678793, at *8 (S.D. Ohio Dec. 14, 2001) (citing *Yeager v. Reliance Standard Life Ins. Co.,*. 88 F.3d 376, 381 (6th Cir. 1996)).

## IV. ANALYSIS

This Court finds Defendant's decision to terminate Plaintiff's benefits was not "rational in light of the plan's provisions." *McDonald*, 347 F.3d at 172. As a threshold consideration,

-10-

Defendant accorded absolutely no weight to Plaintiff's receipt of Social Security Disability Benefits, despite its strong encouragement that she receive them and its subsequent reduction of her benefits in accordance with her receipt of them. Additionally, the non-treating physicians' reports, which MetLife relied upon when terminating her benefits, contained significant inconsistencies regarding whether she was receiving "appropriate care and treatment" that Defendant should have reconciled by obtaining more information.

### A. Social Security

Plaintiff argues that MetLife's disregard of her receipt of Social Security Disability Benefits ("SSDB") is arbitrary and capricious. Although Plaintiff acknowledges that "the plan administrator is not required to follow the determination of the [SSA]," citing *Hurse v. Hartford Life & Accident Ins. Co.*, No. 02-5496, 2003 WL 22233532, at *6 (6th Cir. Sept. 26, 2003), Plaintiff argues that the plan administrator must accord some weight to the SSA's determination in light of its having strongly encouraged her to apply for them. (Pl. Mot. at 13) (citing *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 530 (6th Cir. 2003) ("[I]t is totally inconsistent for Fortis to request that Darland apply for Social Security disability benefits, yet avail itself of that Social Security determination regarding disability to contend, at the same time, that he is not disabled."), (*overruled on other grounds by Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003))).

Defendant counters that the Plan does not actually require a plan participant to apply for SSDB, but merely contains an offset allowing SSA benefits to be deducted from the amount paid from the LTD Plan. (Admin. Rec. 391) ("The benefits payable under the LTD Plan will be reduced by: the actual or estimated primary Social Security Disability Income benefits which you

-11-

are . . . entitled to by reason of your disability"). Defendant cites to the Supreme Court decision, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003), for the proposition that "critical differences" between social security and ERISA benefits plans obviate any need for the plan administrator to rely on the SSA's determinations, and argues that Plaintiff's reliance on *Darland* is misplaced because *Nord* overruled *Darland*.

*Nord* overruled *Darland* to the extent that *Nord* absolved plan administrators of any obligation to accord special deference to the opinions of treating physicians. *Nord*, 538 U.S. 822, 834 (2003) ("Courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."). *Nord* has been further interpreted to hold that administrators of disability insurance plans under ERISA are not *bound* by the SSA's disability determinations. *Hurse v. Hartford Life & Accident Ins. Co.*, No. 02-5496, 2003 WL 22233532, at *6 (6th Cir. Sept. 26, 2003) ("[I]t would be incongruous to hold that, although the "treating physician rule" is not applicable in ERISA cases, the ERISA plan administrator is bound by the disability determination of the SSA"). *Darland*, however, still stands for the proposition that it is "inconsistent for a plan administrator to ignore the SSA's favorable determination, after the administrator had expressly requested the claimant to apply for SSA benefits." *Whitaker v. Hartford Life and Accident Ins. Co.*, No. 03-6682, 2005 WL 147076 (6th Cir. Jan. 25, 2005) (explaining that the Sixth Circuit, in *Darland*, outlined this "unique situation" in which a plan administrator must distinguish the SSA's findings when terminating benefits).

In *Darland*, the plan participant, "at Fortis' insistence," applied for SSDB. *Darland*, 317

-12-

F.3d at 529. After SSA determined that the plaintiff was totally disabled, the plan administrator reduced the amount of monthly disability payments accordingly and requested "overpayment of insurance benefits"; yet, when terminating benefits, the plan administrator accorded no weight to the SSA's determination. *Id.* at 530. The court found this dissonance untenable, explaining that "the principles of judicial estoppel certainly weigh against Fortis taking such inconsistent positions." *Id.* (citing *Ladd v. ITT Corp.*, 148 F.3d 753, 755-56 (7th Cir. 1998) (concluding that the plan administrator's disregard of the SSA's determination, after it pushed plaintiff to apply and benefitted from the SSA award, was incompatible because "[h]aving won once the defendants repudiated the basis of their first victory in order to win a second victory")).

The same scenario arises in the present case. MetLife's policy, as evidenced by its form titled "Reimbursement Agreement for Social Security," requires plan participants to acknowledge that a failure to submit an award or denial notice from SSA will result in the reduction of LTD benefits by the amount MetLife estimates that the plan participant would have received from SSA. (Admin. Rec. at 132). The same form also explains that if SSDB are awarded, the plan participant must "return any overpaid amount to Metropolitan." *Id.* In Plaintiff's case, MetLife contacted Plaintiff, by letter, on at least three occasions[13] requesting Plaintiff apply for SSDB. (Admin. Rec. at 155, 189, 195). MetLife even provided her with the name of a professional service, Kennedy & Associates, to help with the application process, explaining that "there will be no out-of-pocket expenses to you for the services rendered by this firm." (Admin. Rec. at 196). While the letters to Plaintiff insisted that "this is a voluntary

---

[13]The letters are dated July 12, 1999; September 17, 1999; and March 20, 2000 and appear in the Administrative Record at pages 155, 189, and 195, respectively.

-13-

program," they simultaneously "strongly urge[d] [Plaintiff] to take advantage of this service." *Id.* Additionally, Kennedy & Associates appears to have maintained its own contacts with Ms. Borys. On May 30, 2000, Kennedy & Associates informed MetLife that "we are ceasing our efforts to secure the cooperation of Kathleen Borys in pursuit of Social Security Disability Insurance Benefits [and] [w]e were informed by the claimant that she requires no assistance." (Admin. Rec. at 125). Indeed, Ms. Borys did apply for and receive SSDB without the assistance of either MetLife or Kennedy & Associates. (Admin. Rec. at 94).

According to Section 3.4.5 of the Long Term Disability Plan, MetLife stands to benefit from a plan participant's receipt of SSDB: "The benefits payable under the LTD Plan will be reduced by: the actual or estimated primary Social Security Disability Income benefits which you are . . . entitled to by reason of your disability." (Admin. Rec. at 391). Moreover, the Plan requires the plan participant to "promptly refund to Metropolitan an amount equal to all overpayments due the [Plan]," warning, "[i]f you do not promptly make such refund to Metropolitan, Metropolitan may reduce or offset against any future Long-Term Disability benefits payable to you." *Id.*

The findings of the Social Security Administration "should have at least been noticed" by MetLife during its review of Plaintiff's claim. *See Hurse* at *6 (noting that SSA determinations on benefits "should carry significant weight" if "there is evidence that the plan administrator urged or aided the claimant in his pursuit of social security benefits"); *Napier v. Hartford Ins. Co.*, 282 F. Supp. 2d 531 (E.D. Ky. 2003) (holding that Hartford "erroneously ignored" the SSA's determination of complete disability after it "actively encouraged" Plaintiff to seek SSDB). The Court recognizes that the record underlying the SSA's determination of complete

-14-

disability is sparse; however, MetLife's failure at least to distinguish the SSA's findings in its termination letters to Plaintiff is incompatible with its policy advocating her receipt of SSDB. *Pierce v. Kentucky Utilities Co. Long Term Disability Plan*, 357 F. Supp. 2d 979, 989-90 (E.D. Ky. 2005) (questioning the propriety of a plan administrator's attempt "to lighten the cost to an employee welfare plan" by "encourag[ing] and support[ing] a claimant to demonstrate total disability to the Social Security Administration [and] reduce the welfare plan's payment by the amount of the social security award, yet then turn around and deny that the claimant is totally disabled under the employee welfare plan"). Even assuming MetLife had no inherent conflict of interest in 2003, the Court holds that where a plan administrator has strongly encouraged a plan participant to obtain SSDB and received a monetary benefit therefrom, the plan administrator must explicitly distinguish the SSA's finding of total disability upon termination. The SSA's determination is by no means *binding*, but it should be properly addressed.

In the case sub judice, neither the June 6, 2003 initial termination letter nor the November 3, 2003 final termination letter mentioned, let alone distinguished, the SSA's determination of total disability despite MetLife's near insistence that she apply and MetLife's benefit therefrom. (Admin. Rec. at 47, 27). MetLife should have explicitly distinguished the finding of the SSA in its termination letters to Plaintiff.[14]

### B. Doctors' Reports and Inconsistencies Therein

Plaintiff argues that the reports of the two board certified psychiatrists were grossly

---

[14]Defendant argues that Plaintiff, on appeal, did not argue that her award of SSDB should be considered and thus Defendant was under no obligation to address the issue. The Court finds this argument unpersuasive. Plaintiff's failure to raise the issue on appeal to MetLife does not change MetLife's obligation to address the SSA's determination of total disability when terminating benefits.

inconsistent with one another, such that they could not have formed the basis for MetLife's decision to terminate Plaintiff's benefits. Plaintiff asserts that MetLife should have conducted an Independent Medical Examination ("IME"), in which the Plaintiff would actually have been evaluated by one of MetLife's physicians, or should have required her to submit additional information. Defendant argues that MetLife was under no obligation to do so because Plaintiff, not Defendant, had the burden to submit proof of disability. Moreover, Defendant asserts that the two physicians' reports were not wholly inconsistent because their end-results were the same: Plaintiff was not totally disabled.

Plaintiff's argument is well-taken. MetLife's conclusion that Plaintiff was no longer totally disabled was not based on reasoned evidence in light of the fact that Dr. Gosline and Dr. Lipsitch disagreed on a crucial point: whether Plaintiff was receiving appropriate care and treatment. This incongruity, coupled with both doctors' findings of a lack of objective evidence underlying the case, leads this Court to conclude that MetLife's termination was not supported by record.

Dr. Gosline's report, as MetLife admitted at oral argument, consisted only of his answers to a list of four pointed questions posed by MetLife.[15] To help Dr. Gosline answer those

---

[15] MetLife posed the following four questions to Dr. Gosline:
- A. Please give your opinion of [Ms. Borys] present condition, her treatment, functionality, and prognosis.
- B. Do you feel that [Ms. Borys] is under appropriate care and treatment as defined in the IBM contract plan as specified? If not, please be specific in what way and make recommendations for appropriate treatment.
- C. Do you feel that [Ms. Borys'] condition is of a severity that would prevent her from performing any and all work activities? Please make any further recommendations you feel would be appropriate and /or contract LCSW to discuss any issues.
- D. Do you feel that a neuropsychiatric IME would be useful? Any other

questions, MetLife provided him with the definition of "appropriate care and treatment," as well as the Plan's requisite qualifications of the treating mental health specialist and the type of rehabilitation that the Plan mandates. These types of narrowly tailored and somewhat suggestive questions have raised doubts in this circuit about the ensuing report's reliability. *See Finazzi v. Paul Revere Life Ins.*, 327 F. Supp. 2d 790, 795 (W.D. Mich. 2004) (questioning the reliability of reviewing physicians whose reports failed to "challenge or criticize" the plaintiff's treating physicians and who "merely answered questions posed to them"); *see also Donatiello v. Hartford Life and Accident Ins. Co.*, 344 F. Supp. 2d 575, 582 (E.D. Mich. 2004) (distinguishing *Finazzi*, in part, by stating that "Plaintiff does not allege that Defendant provided guiding questions to Dr. Lyon," the insurance company's physician consultant). Dr. Gosline also failed to challenge any particular mental health professional's finding or diagnosis by any of Plaintiff's physicians, including Teresa Quinlin, M.D., Stephen Pariser, M.D., and Steven Schneir, M.D., merely stating, without reference to any particular physician's report, that efforts to medicate Plaintiff were apparently without "titration or compliance of the medications." (Admin. Rec. at 51). Similarly, in his discussion of Mr. Egan's therapy, he does not mention any of Plaintiff's specific symptoms nor Mr. Egan's lengthy letters regarding her prognosis and condition. (Admin. Rec. at 51). In fact, Dr. Gosline merely concludes, in answer to MetLife's question, "Do you feel that [Plaintiff] is under appropriate care and treatment as defined in the [Plan]?," that Ms. Borys' therapy with Mr. Egan is not "appropriate care and treatment" because "for whatever reason the therapy appears to be relegated simply and merely to discussing interpersonal issues and

---

       recommendations for claim management?

(Admin. Rec. at 50-52).

-17-

difficulties in interpersonal relationships, rather than dealing with any psychiatric disorder, although such a disorder is being claimed." (Admin. Rec. at 52). Dr. Gosline never called Mr. Egan, although doing so was explicitly permitted by MetLife. (Admin. Rec. at 50) (containing a "Physician Consultant Review" form, which provides an area for the reviewing doctor to indicate any telephone calls conducted with the treating medical professionals).

On appeal, the second reviewing doctor, Dr. Lipsitch, submitted a considerably more thorough review of Plaintiff's medical record, commenting both on the physician's diagnoses of Ms. Borys from 1997-2000 and the various advances and setbacks Plaintiff encountered in her treatment with Mr. Egan.[16] Notably, Dr. Lipsitch arrived at a different conclusion regarding the appropriateness of Plaintiff's treatment than that reached by Dr. Gosline, finding as follows:

> The fact that claimant was not taking medications is not per se inappropriate treatment in view of what appear to be persistent and sustained efforts to find a regimen that would both help her and be tolerated by her.
>
> . . . .
>
> It is impossible to assess the appropriateness of the psychotherapy she was receiving since the details of the content and quality of the interaction between the therapist and the claimant is not described in the notes or the letters . . . Thus, while the frequency of the treatment is appropriate in view of the length of treatment, the content, technique and focus are impossible to evaluate.

(Admin. Rec. at 34).

---

[16]Dr. Lipsitch stated as follows in regard to Plaintiff's condition:

Mr. Egan's progress notes are brief, but regular. In 2002, they focused mostly on the claimant's degree of withdrawal and isolation. It also noted the fact that her husband was forced into retirement. In October 2002, she seemed to become more active and less isolated. She also had somewhat improved motivation. However, by the spring of 2004, she seems more isolated again.

(Admin. Rec. at 33).

-18-

In terminating Plaintiff's benefits, MetLife does not reconcile the doctors' disparate conclusions regarding the appropriateness of Plaintiff's treatment. *See Heffernan v. Unum Life Ins. Co.*, No. 02-3412, 2004 WL 1327868, at *8 (6th Cir. June 11, 2004) (finding UNUM lacked "substantial evidence" where its termination decision was based on one in-house doctor's opinion that the treating physician's diagnosis did not "exist" when the other in-house doctor described it as a "popular theory"); *see also Napier v. Hartford Life Ins. Co.*, 282 F. Supp. 2d 531, 538 (E.D. Ky. 2003) ("[I]t seems odd that when faced with inconsistent findings, Hartford did not order recent EMG testing to determine the true nature of Napier's disability"). Moreover, if assessing the appropriateness of Plaintiff's treatment was "impossible" for Dr. Lipsitch to do, given the lack of available information, this Court cannot comprehend how the same medical record can support the conclusion by either doctor that she is not totally disabled.[17] The burden to prove disability, as Defendant rightly points out, is on the Plaintiff;[18] however, this burden

---

[17] MetLife's final termination letter to plaintiff, dated November 3, 2003, does not reconcile the inconsistent findings with regard to "appropriate care and treatment," stressing that Dr. Lipsitch found "no objective data upon which to conclude that there are clear pervasive functional impairments present that render the claimant unable to perform in an appropriate job." (Admin. Rec. at 34).

[18] Where a plan places the burden of proof on the plan participant to put forth sufficient information that she is disabled, such language has consistently been upheld by reviewing courts. In *Miller v. Metro. Life Ins. Co.*, the court construed the plan, which stated "[O]n demand from the insurance Company[,] further satisfactory proof, in writing, must be submitted to the insurance Company that the disability continues," as requiring the plan participant to submit proof of disability. *Miller*, 925 F.2d 979, 984-85 (6th Cir. 1991) ("[U]nder the terms of the Plan, it is the employee who must continue to supply on demand proof of continuing disability to the satisfaction of the insurance company."); *see also Wilson v. Metlife, Inc.*, No. 03-10045-BC, 2005 WL 475440, at *5 (E.D. Mich Feb. 10, 2005) (construing *Miller* to support the "general argument that when the plan allocates the burden of proving disability, it is binding on the parties and finding plaintiff failed to meet the burden in MetLife's contract when she failed to provide information of her full disability that was "satisfactory to" the plan administrator).

does not eviscerate MetLife's duty to offer a "reasoned explanation, based on the evidence" for its decision to terminate benefits. *Davis v. Kentucky Finance Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal citations omitted).

## V. CONCLUSION

As explained in *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003), the arbitrary and capricious standard, although highly deferential, is not merely a "rubber stamp" for a plan administrator's decision, but includes "some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id.* This Court finds MetLife's termination of Plaintiff's benefits arbitrary and capricious because it disregarded the SSA's determination of total disability and relied on inconsistent physicians' opinions, one of which found the medical record inadequate when determining the appropriateness of Plaintiff's treatment.

Accordingly, the Court **GRANTS** Plaintiff's Motion for Judgment on the Administrative Record and the relief requested therein. Judgment is therefore rendered against Defendant for all disability benefits accrued and unpaid to the date of the judgment and a declaratory judgment that Plaintiff is an eligible participant under the Plan and is entitled to monthly disability benefits.

**IT IS SO ORDERED**

/s/ Algenon L. Marbley
Algenon L. Marbley, Judge
United States District Court

Dated: May 4, 2005